FILED

2024 May-06  PM 12:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | | |
|---|---|---|
| TRACY VIATOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  6:22-cv-01518-HNJ |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Tracy Viator seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 10).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.  *See* 20 C.F.R. § 404.1520(a)(4).  The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far.  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ."  *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02.  *Id.* at § 404.1520(d).  If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R.  §§ 404.1520(a)(4)(iii),

404.1525.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11ᵗʰ Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11ᵗʰ Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. § 404.1520(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* § 404.1520(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  *Id.* § 404.1512(b)(3), 404.1520(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* § 404.1520(a)(4)(v); *see also id.* § 404.1520(g).

3

If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11ᵗʰ Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11ᵗʰ Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11ᵗʰ Cir. 1991)). Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 587 U.S. – , 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11ᵗʰ Cir. 1983) (citations omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11ᵗʰ Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Viator protectively filed an application for a period of disability and disability insurance benefits on October 20, 2020, alleging disability as of October 7, 2019.  (Tr. 219).  On February 5, 2021, the Commissioner denied her claims.  (Tr. 114-17).   On March 3, 2021, Viator requested reconsideration of the Commissioner's decision (Tr. 125).  The Commissioner reviewed Viator's claim yet determined the previous denial was proper under the law.  (Tr. 126-35).  On May 4, 2021, Viator filed a request for a hearing.  (Tr. 136).  On December 1, 2021, the ALJ held a hearing.  (Tr. 42-76).  On March 11, 2022, the ALJ issued an opinion denying Viator's claims.  (Tr. 19-37).

Applying the five-step sequential process, the ALJ found at step one that Viator did not engage in substantial gainful activity after October 7, 2019, her alleged disability onset date.  (Tr. 25).  At step two, the ALJ found Viator manifested the severe impairments of cervical spinal stenosis, status post anterior cervical discectomy and fusion (ACDF), left knee degenerative joint disease, left shoulder supraspinatus tendinopathy and impingement, fibromyalgia, and obesity.  (*Id.*).  At step three, the ALJ found that Viator's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 29).

Next, the ALJ found that Viator exhibited the residual functional capacity ("RFC") to perform light work, with the following additional limitations:  "she can frequently climb ramps and stairs.  She can occasionally balance, stoop, kneel, crouch,

and crawl.  She should avoid ladders, ropes, scaffolds, unprotected heights, commercial driving, and hazardous machines.  She can occasionally reach overhead.  She can have occasional exposure to extreme temperatures, humidity, and vibration." (*Id.*).

At step four, the ALJ determined Viator retained the ability to perform her past relevant work as a retail shift manager.  (Tr. 35).  At step five, the ALJ alternatively determined, considering Viator's age, education, work experience, and RFC, she could perform a significant number of other jobs in the national economy, including cashier II, ticket taker, and ticket seller.  (Tr. 35-36).  Accordingly, the ALJ determined Viator has not suffered a disability, as defined by the Social Security Act, since October 7, 2019.  (Tr. 37).

On March 30, 2022, Viator filed a request for review of the ALJ's opinion before the Appeals Council.  (Tr. 214).  On October 11, 2022, the Appeals Council denied Viator's request for review, making the ALJ's decision the Commissioner's final decision.  (Tr. 1-3).  Viator filed her complaint with this court on December 1, 2022. (Doc. 1).

## ANALYSIS

In this appeal, Viator argues the ALJ improperly evaluated her subjective complaints of pain, resulting in an RFC finding that lacks substantial evidentiary support.  For the reasons discussed below, the undersigned concludes Viator's contentions do not warrant reversal.

As previously discussed, at step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing his or her "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The claimant's RFC represents "the most [he or she] can still do despite [their] limitations." *Id.* at § 404.1545(a)(1). Assessing a claimant's RFC lies within the exclusive province of the ALJ. *See id.* at § 404.1527(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); *id.* at § 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017 WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

Viator argues the ALJ improperly found she possessed the residual functional capacity to perform a limited range of light work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Viator contends her subjective symptoms prevent her from performing light work.

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Wilson*[ *v. Barnhart*], 284 F.3d [1219,] 1225[ 11ᵗʰ Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11ᵗʰ Cir. 2021).  A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11ᵗʰ Cir. 1991) (citation omitted).

Social Security Ruling ("SSR") 16-3p mandates the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."  SSR 16-3p, *7 (Mar. 16, 2016).  An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3), (4); *see*

*also Bailey v. Soc. Sec. Admin., Comm'r*, 791 F. App'x 136, 143 (11th Cir. 2019) ("'If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects' of the fibromyalgia symptoms, the ALJ will 'consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.'" (citing SSR 12-2p, 77 Fed. Reg. 43643 (July 25, 2012))).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").[2]

---

[2] As noted, Viator suffers from fibromyalgia, among other conditions. "[F]ibromyalgia . . . is 'characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months.'" *Laurey v. Comm'r of Soc. Sec.*, 632 F. App'x 978, 987-88 (11th Cir. 2015) (citing SSR 12-2p, 77 Fed. Reg. 43640, 43641 (July 25, 2012)). "The symptoms of fibromyalgia 'can wax and wane so that a person may have bad days and good days.'" *Bailey v. Soc. Sec. Admin., Comm'r*, 791 F. App'x 136, 142 (11th Cir. 2019) (citing SSR 12-2p, 77 Fed. Reg. 43644 (July 25, 2012)). "For this reason, 'longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of [fibromyalgia].'" *Id.* at 142-43 (alteration in original) (citing SSR 12-2p, 77 Fed. Reg. 43642 (July 25, 2012)).

However, it remains settled in the Eleventh Circuit that "a lack of objective evidence" constitutes the "hallmark" of fibromyalgia. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *accord Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x. 855, 863 (11th Cir. 2017) (per curiam); *Brown-Gaudet-Evans v. Comm'r of Soc. Sec.*, 673 F. App'x. 902, 906 (11th Cir. 2016) (per curiam); *Hernandez v. Comm'r of*

Viator testified during the December 1, 2021, administrative hearing that she underwent cervical spine fusion surgery in early November, and she had not yet fully recovered.  Before the surgery, she experienced level 7-8 pain in her cervical spine that radiated into her arms, leaving her arms feeling numb and causing her to drop items. (Tr. 48-49).  Osteoarthritis and fibromyalgia in her hips also caused problems with her ability to work.  The pain medications she received after surgery helped some with her other pain symptoms.  (Tr. 50-51).

She also experienced depression and anxiety, which have increased as her physical symptoms worsened.  When she worked, she would sometimes cry for no reason.  She needed to take extra work breaks or miss days of work because she could not cope with everyday life.  She feels uncomfortable at family gatherings or any other situations with a large number of people.  An activity like grocery shopping may trigger a panic attack.  (Tr. 51-53).

Viator does not sleep well because of her neck, shoulder, and hip pian.  She can prepare a sandwich or microwave meal, but she does not do any other cooking because

---

*Soc. Sec.*, 523 F. App'x. 655, 657 (11th Cir. 2013) (per curiam); *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x. 56, 63 (11th Cir. 2010) (per curiam).  Fibromyalgia "often lacks medical or laboratory signs, and is generally diagnosed mostly on a[n] individual's described symptoms." *Moore*, 405 F.3d at 1211.  Thus, "a claimant's subjective complaints of pain are often the only means of determining the severity of a patient's condition and the functional limitations caused thereby[,] . . . 'render[ing] . . . over-emphasis upon objective findings inappropriate.'" *Somogy*, 366 F. App'x at 64 (fourth alteration in original) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (11th Cir. 2007)).

Therefore, "[t]he pain standard also guides the ALJ's evaluation when a claimed disability is fibromyalgia." *Bailey*, 791 F. App'x at 142; *see also Laurey*, 632 F. App'x at 987 ("The ALJ uses these same standards to evaluate a claimant's fibromyalgia.").

she fears she will forget she is cooking. She needs help washing her hair because she cannot reach up or bend over. She also needs help tying her shoes and putting on pants. She can sit for ten to 15 minutes, then she needs to stand for ten to 15 minutes. She reads the Bible and watches television, but she cannot focus on those activities long because of the pain.

Her post-surgical pain medication makes her sleepy, so she needs to take naps during the day. However, prior to the surgery, she did not take any prescription medication. She cannot bend her neck to look upward, downward, or to the side. She cannot focus on any task for more than approximately ten minutes. In addition to addressing her daytime sleepiness, lying down on pillows temporarily alleviates her neck pain. She needs to lie down for a total of several hours every day. (Tr. 54-62). If she could not lie down, she would experience "burning and just horrific tingling" neck pain. (Tr. 62). Viator's partner performs most household tasks, as Viator can do no more than fold a few towels and prepare sandwiches and microwave meals. Even before her surgery, Viator did not drive because she experienced numbness and tingling in her arms, particularly her left arm, and she could not adequately turn her head. (Tr. 62-66).

Viator also submitted a November 19, 2020, Function Report as part of her disability application. She reported constant pain in her neck, shoulder, and knee. She does not sleep well because of her neck and shoulder pain. She cannot sit for very long before her neck starts hurting, and she cannot stand for very long before her knee starts hurting. She has trouble dressing because she cannot raise her left shoulder to put on

a shirt, and her knee buckles when she attempts to put on pants.  She cannot shave because her knee buckles, and reaching overhead causes shoulder and neck pain.

She can prepare simple meals that require only heating up.  Beyond that, she cannot cook because her shoulder pain causes her to drop items, she cannot stand long enough to complete the task, and she cannot lift a skillet or bottle of water.  She does not do any chores because of pain and an inability to stand.  She goes outside only to sit on her porch.  She drives only when she must attend a doctor's appointment, but doing so wears her out.  She shops infrequently, and only for necessary items.  Her partner does most of the household shopping.

She can perform financial tasks like paying bills, counting change, handling a savings account, and using a checkbook.  She has no hobbies or interests other than watching television, but she cannot do that for very long at a time because she falls asleep and cannot sit still.  She speaks to others on the telephone, yet she does not otherwise socialize due to pain, bipolar disorder, social phobia, and anxiety.

Her condition affects her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use her hands, and get along with others.  She cannot walk for long without needing to rest for at least a few minutes.  She cannot concentrate for long, and she does not finish tasks because she does not begin them.  She does "ok" with written and spoken instructions.  She tries to respect authority figures, but she sometimes loses her temper and feels others are acting mean.  However, she has not lost a job due to problems getting along with others.  She does not adequately manage stress or change,

and she feels stress about the world ending.  She uses a brace or splint every day.  Her medications include ibuprofen and a muscle relaxer.  (Tr. 278-89).

The ALJ acknowledged Viator's Function Report and hearing testimony.  After weighing that testimony and the medical evidence, the ALJ found Viator's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (Tr. 30).  Despite Viator's severe impairments, the ALJ concluded she could perform a limited range of light work.  (Tr. 30, 33).  In so finding, the ALJ properly applied the Eleventh Circuit pain standard.  Moreover, the ALJ adequately articulated the reasons for his finding, and the finding enjoyed substantial evidentiary support.

First, the record medical evidence supports the ALJ's conclusion.  Primary care records from Whatley Health Services between January 23, 2018, and March 18, 2020, depict Viator primarily appeared for treatment of acute medical conditions, and clinical examinations produced findings related only to those conditions.  (Tr. 333-377).  On one occasion, January 23, 2018, Viator complained of left knee pain, and the clinical examination revealed mild pain with range of motion in the left knee. (Tr. 339-41).

Viator received treatment from the Clinic for Rheumatic Disease between October 11, 2018, and May 4, 2019.  (Tr. 378-415).  On October 11, 2018, Viator reported constant aching joints, dropping items with her right hand, occasional

numbness in her toes when she awakens, severe fatigue, hand and ankle swelling, anxiety, depression, migraines, poor sleep, and restless legs.  The clinical examination revealed mild pain and tenderness with range of motion in the cervical spine; soft tissue discomfort in the right posterior shoulder, upper back, low back, and right lateral epicondyle; and six out of 18 total tender points.  Viator displayed tenderness in 40 joints, including her right shoulder, right elbow, right wrist, left wrist, right hand, left hand, left knee, right knee, left ankle, right foot, and left foot.  (Tr. 380-86).  The treatment record contains two different pain scale scores on this date:  3 and 7.5.  (Tr. 380, 386).

On October 22, 2018, a right elbow x-ray revealed a small marginal osteophyte of the olecranon process.  (Tr. 388).  X-rays of both feet revealed small marginal osteophytes of the inferior calcaneal tuberosity, but no other bony or soft tissue abnormalities.  (Tr. 389).  X-rays of both hands produced normal findings.  (Tr. 390).  A sacroiliac x-ray revealed sclerosis in both SI joints, and erosion of the left SI joint could not be excluded.  (Tr. 391).  Viator received a positive antinuclear antibody (ANA) test, indicating a possible autoimmune disorder.  (Tr. 392-99).

On November 1, 2018, Viator returned to receive her laboratory and x-ray results, but the doctor did not conduct a clinical examination.  Viator reported level-nine pain.  (Tr. 399-402).

On January 9, 2019, Viator reported hurting everywhere, but primarily in her neck, wrists, hands, knees, and right elbow.  The pain heightens in the morning and

14

after extended sitting.  She sleeps well but nonetheless wakes feeling very unrested.  She rated her typical pain level at seven of ten, and she rated her typical fatigue level at eight of ten.  She needed to leave work early two days before the appointment due to pain. Taking ibuprofen helps with the pain.  She also experiences numbness in her left second toe, mostly in the early morning.  Her fingers sometimes appear blue when she takes a warm shower.  She reported headaches, memory difficulty, anxiety, and depression. The physical examination produced tenderness at the cervical, thoracic, and lumbar spine; normal gait; soft tissue discomfort in 17 out of 18 tender points; normal memory; full orientation; appropriate mood and affect; and tenderness in 72 joints.  Dr. Donna Maneice prescribed Cymbalta.  (Tr. 403-07).

On May 3, 2019, Viator reported her overall pain improved after starting Cymbalta, but she still experienced aches and pains all over, particularly after waking in the morning.  She continued to experience fatigue, and she believed Cymbalta may have caused restless leg sensations when she sleeps.  She feels tired every day, and she often experiences headaches.  She also reported anxiety and depression.  The physical examination produced tenderness of the cervical, thoracic, and lumbar spine; normal gait; normal deformity or diminished joint range of motion; soft tissue discomfort in eleven out of 18 tender points; and 72 tender joints.  Nurse practitioner Mary Beth Loomis added Celebrex to Viator's medications and referred her for a sleep study.  (Tr.

408-13).[3]

Viator suffered a workplace accident on August 26, 2019.  She slipped and fell, using her left arm to break her fall.  (Tr. 417, 669).

On September 19, 2019, Viator saw Dr. John Miller at Norwood Clinic for a worker's compensation evaluation of her left neck and shoulder.  She displayed fullness in the left trapezius supraspinatus area with palpatory tenderness over the supraspinatus, and decreased range of motion in the left upper extremity.  Dr. Miller opined Viator experienced a muscle spasm, prescribed physical therapy and anti-inflammatories, and imposed a 15-pound lifting restriction.  (Tr. 693-95).  On October 10, 2019, Viator reported to Dr. Miller that the treatment did not help.  Dr. Miller continued to assess a muscle strain.  He changed Viator's medications, and he continued her physical therapy.  (Tr. 696-98).

Viator received treatment from Honeycutt Chiropractic between October 11, 2019, and April 9, 2020.  (Tr. 416-50).  During her initial examination, Viator stated she suffered a work accident on August 26, 2019, which resulted in level-nine pain in her neck, left shoulder, and left knee, in addition to headaches and difficulty sleeping.  She also experiences constant stiffness and swelling.  The pain interferes with her abilities to perform all activities.  The clinical examination revealed positive bilateral foramina compression, indicating possible cervical disc lesion or misalignment; positive shoulder

---

[3] The record does not contain any sleep study results.

depressor test on the left, indicating cervical or brachial nerve root irritation; positive dynamometer test on the left, indicating the interplay of muscle and nerve in the upper extremity; positive Kemp test bilaterally, indicating possible lumbar disc and root lesion; and muscle spasms in the cervical, thoracic, and lumbar spine, indicating possible interference with the function of a muscle or group resulting in possible restricted range of motion.  She displayed some pain with the heel and toe walk, and she produced an antalgic gait.  She displayed decreased range of motion in the cervical spine with moderate pain.  (Tr. 417-18).

Viator underwent three MRI's on October 17, 2019.  The cervical spine MRI revealed normal alignment of the cervical vertebrae with no listhesis, fracture, focus, osseous lesion, infection, or acute ligamentous injury.  At C3-4 through C5-6, Viator experienced spinal stenosis with flattening of the spinal cord due to disc bulges and disc herniations.  She also experienced left C4-5 neural foramen narrowing that may affect the left C5 nerve root.  (Tr. 421-22).  The left shoulder MRI revealed supraspinatus tendinopathy without a rotator cuff tear, but otherwise unremarkable results.  (Tr. 423).  The left knee MRI revealed a horizontal tear of the medial meniscus and chondromalacia patella.  (Tr. 424).

Throughout her treatment with Honeycutt Chiropractic, Viator reported pain in her neck, back, shoulder, and knee; headaches; stiffness; difficulty sleeping; difficulty turning her neck; and antalgic gait.  However, toward the end of the treatment period, her gait and sleep improved, and she could more easily sit down and arise from a seat.

(Tr. 425-450).

Viator received treatment for left shoulder and neck pain from Dr. Jeffrey Davis at Andrews Sports Medicine and Orthopaedic Center on March 11, 2021.  Her symptoms related to her August 2019 work injury.  She reported constant pain ranging from level six to level ten, with the typical score at approximately level eight.  She had received no relief from her symptoms so far.  The clinical examination revealed full alertness and orientation, emotional affect, and intact sensation in bilateral upper and lower extremities.  In the cervical vertebrae, Viator experienced normal flexion, extension, and lateral rotation without pain; satisfactory range of motion; negative Spurling's test; and significant tenderness to palpation at the left neck.  In her left shoulder, Viator displayed no deformity, atrophy, or crepitation, and she experienced moderate tenderness to palpation.  She displayed good range of motion, negative impingement signs, full muscle strength, negative cross-arm test, negative Speed's test, negative apprehension, no scapular winging, and satisfactory bicep and tricep strength. Viator displayed guarded behavior throughout the examination.  The right shoulder examination was normal.  (Tr. 669-70).

On April 6, 2021, after reviewing Viator's past imaging results, Dr. Davis recommended physical therapy for her left shoulder, and he referred her to a cervical spine specialist for evaluation of her neck issues.  (Tr. 662).

On April 21, 2021, Viator commenced physical therapy at Renew Rehab & Wellness.  She reported shoulder pain at an average level of eight of ten, along with

numbness and tingling down into her left hand, causing problems with grip. She can lift her arm only to shoulder height and lift only light to moderate objects, but performing both of those movements causes pain. During the session, Viator held her left arm and neck in a very stiff posture. She displayed decreased range of motion, widespread tenderness surrounding the shoulder, and intact sensation and reflexes. (Tr. 657-58).

On May 12, 2021, a physical therapist noted Viator had not progressed much after seven sessions. She continued to experience significant numbness in her left hand and fingers at times. (Tr. 649).

Also on May 12, 2021, Viator informed Dr. J. Todd Smith at St. Vincent's Orthopedics that she fell on her left arm at work, resulting in persistent pain in her neck down into her left shoulder and arm, with numbness and tingling in her left hand. She cannot turn her head fully, and attempting to do so causes pain and numbness. She did not experience neck or shoulder problems prior to the fall. During the clinical examination, Viator displayed full muscle strength in the right deltoid and very slight weakness in the left deltoid. She possessed full strength in the biceps and triceps bilaterally. She experienced very slight weakness in the left intrinsics compared to the right. She displayed normal gait and station. Upon reviewing Viator's past x-ray and MRI results, Dr. Smith concluded she experienced left upper extremity radicular symptoms, with possible peripheral entrapment neuropathy, related to her August 2019 work injury. (Tr. 534-35).

19

On May 19, 2021, a physical therapist stated Viator had experienced minimal progress.  Her shoulder strain had improved, but the radicular symptoms continued. (Tr. 643).

On May 21, 2021, Dr. Davis opined Viator reached maximum medical improvement for her left shoulder.  He released her to full work duty vis-à-vis her shoulder, and he recommended she follow up with Dr. Smith for her cervical spine. (Tr. 635-36, 641, 645-46).

Dr. Smith obtained a cervical spine MRI on June 2, 2021.  The imaging revealed mild-to-moderate left foraminal narrowing with patent right foramen at C3-C4, left uncinate spurring and facet hypertrophy producing severe left foraminal stenosis with patent right foramen at C4-C5, annular bulge with moderately severe left and severe right foraminal stenosis at C5-C6, and minimal central disc protrusion without cord compression and only mild foraminal narrowing at C6-C7.  (Tr. 529, 533).

Dr. Smith referred Viator to Southlake Orthopaedics for additional treatment of her neck between June 7 and July 7, 2021. (Tr. 485-517).  Her June 7, 2021, intake form stated she experienced headaches, heartburn, muscular weakness, tingling, numbness, loss of balance, anxiety, depression, and pain and numbness in her neck and shoulder. Her problems resulted from an August 26, 2019, work injury.  She reported level-seven pain in her neck, shoulder, and knee, but the pain sometimes exceeded level seven. Sleeping, sitting, and turning her head exacerbated her symptoms.  Heat improved her symptoms, but only for a short time.  Her pain disrupted her sleep and interfered with

physical activities.  Physical therapy did not help her symptoms in the past.  She reported a history of arthritis, depression, anxiety, and osteoporosis.  Her medications consisted of 800 milligrams of ibuprofen. (Tr. 502-05).

On July 7, 2021, Dr. Michael Ellerbusch administered a left upper extremity needle electromyogram.  The procedure produced extremely limited results due to Viator's inability to tolerate the needle insertion.  Dr. Ellerbusch detected possible mildly enlarged motor amplitudes in the left deltoid and biceps, possibly consistent with a chronic radiculopathic process at C5, but he could not correlate the study with the cervical paraspinals or rhomboids.  He also detected radiating pain and paresthesias in the left upper trapezius and left periscapular muscles, possibly consistent with myofascial issues with localized trigger points that could contribute to Viator's left upper extremity complaints.  (Tr. 510).

Dr. Ellerbusch's July 7, 2021, clinical examination revealed fairly rigid flattening of Viator's cervical lordosis, limited range of motion on the left side, positive left-sided Spurling's maneuver, and generalized weakness of the left shoulder at 4/5 with the examination causing pain in the left shoulder and upper trapezius.  The left shoulder also demonstrated some signs of impingement.  Viator displayed mild generalized weakness of the left bicep and tricep at 4+/5.  She demonstrated normal strength in the remainder of the upper extremity.  She also demonstrated full orientation, normal mood and affect, intact judgment and insight, normal mental status examination, intact cranial nerves, and normal movements.  (Tr. 514-16).

21

On July 21, 2021, Viator returned to Dr. Smith, continuing to complain of left neck and shoulder pain, numbness and tingling going down into her left hand, and left hand weakness.  During the physical examination, Viator displayed full alertness and orientation and pleasant mood.  She produced a positive Spurling's to the left upper extremity.  She experienced pain with neck extension and rotation to the left, along with paresthesias all the way down to her left hand.  She displayed 4+/5 muscle strength in her left shoulder abduction, 5-/5 left tricep strength, 4+/5 left intrinsics, and full bicep strength.  She displayed slightly decreased sensation to light touch on her left lateral deltoid region.    Based upon the MRI results, nerve conduction studies, clinical history, and physical examination, Dr. Smith concluded Viator experienced left upper extremity radiculopathy.  He recommended surgery to fuse the C4-5 and C5-6 vertebrae, and Viator agreed to undergo the surgery.  Dr. Smith stated Viator could return to work with a 30-pound lifting restriction.  (Tr. 531-32).

On October 26, 2021, Dr. Smith completed an Abilities Form stating Viator could constantly lift up to ten pounds, frequently lift up to 20 pounds, occasionally lift up to 35 pounds, and never lift more than 35 pounds.  She could constantly sit, stand, walk, bend, kneel, drive, finger, handle, and operate foot controls, but she could never climb or reach above her shoulder.  (Tr. 530).

On November 8, 2021, Dr. Smith performed a surgical fusion of the C4-C5 and C5-C6 vertebrae.  (Tr. 710-12).

The record does not contain records from Dr. Smith or any other physician after

Viator's cervical spine surgery.  Viator commenced post-operative physical therapy for her neck on December 14, 2021.  She reported level-four pain at her best and level-seven pain at her worst.  (Tr. 781-85).  On December 15, 17, 20, and 22, 2021, she reported the same range of pain scores.  (Tr. 769-79).  On December 24, 27, and 28, 2021, she reported level-four pain.  (Tr. 760-68).  On December 29, 2021, she reported she still hurt, but she appeared to be feeling better and retaining some range of motion in her neck.  (Tr. 757).  On January 4 and 6, 2022, she again reported pain ranging from level four to level seven.  (Tr. 749-56).

Viator discharged from physical therapy on January 7, 2022.  During her final session, she reported pain ranging from level four to level seven.  She displayed moderate tenderness to palpation in the paraspinal and upper trapezius areas.  The therapist provided the following discharge summary:

> The patient is able to perform exercises correctly.  The patient's progress towards goals is good and her tolerance to treatment is good. Patient consents to treatment plan and goals and gives verbal informed consent.  The patient's discharge prognosis is good.  [Patient] has now completed [plan of care] and will [discharge].  She remains slightly limited in [left upper extremity] shoulder [active range of motion] along [with] cervical [range of motion] although [each] have improved well along with her [pain].

(Tr. 748).

Though Viator made progress, she did not meet all of her physical therapy goals. She did not decrease her pain to a level zero to three.  She fully met only two of her range of motion goals, but she nonetheless significantly increased her range of motion

from the beginning of her therapy sessions.  Similarly, she improved her muscle strength in all areas, though she met only some of her strength goals.  She improved her ability to look up, down, and over her shoulder, but she continued to experience pain when performing those movements.  She obtained limited improvement in her ability to reach overhead, and she continued to experience pain when doing so.  She did not achieve centralization of her radicular symptoms by 25-50%, and she did not decrease the frequency of her headaches by 50%.  (Tr. 745-48).

The record also contains consultative and administrative medical opinions about Viator's condition and abilities.  Social Security regulations state that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  The ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion. *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.  *Id.* § 404.1520c(b)(2).  Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from

other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations. *Id.* § 404.1520c(c)(3)-(5). The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file. *Id.* § 404.1520c(c)(3)(v). The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c)(5).

In addition, "[t]he opinions of agency [medical or] psychological consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source." *Gordon v. Saul*, No. 8:18-CV-829-T-SPF, 2019 WL 4254470, at *5 (M.D. Fla. Sept. 9, 2019) (citing 20 C.F.R. § 404.1513a(b)).[4]

Robert Kline, Ph.D., conducted a consultative psychological examination on

---

[4] "A medical consultant is a member of a team that makes disability determinations in a State agency . . . , or who is a member of a team that makes disability determinations for [the SSA] when [the SSA] make[s] disability determinations." 20 C.F.R. § 404.1616(a). "The medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim." *Id.*

January 15, 2021. Viator reported her sleep fluctuates between four and nine hours a night. Her energy level generally rests at about two out of ten, but she experienced level-five energy on the day of the examination. She could not identify any pleasures in life, and she experiences crying spells twice a week. She reported terrible memory and concentration. She experienced a manic episode a week before the evaluation, meaning she felt good, wanted to do a lot of things, and spent money she did not have. She reported social anxiety prevents her from leaving home. She believed her constant pain, fatigue, and inability to get along with others would prevent her from holding a job.

Dr. Kline observed normal appearance, speech, mood, and affect, with no overt signs of anxiety. During the examination, Viator displayed full orientation; good concentration and attention; good immediate and remote memory; good fund of information; good abstracting abilities; no loose associations or tangential thinking; no confusion; normal speech; good judgment and insight; and no hallucinations, delusions, ideas of reference, phobias, obsessions, compulsions, indecision, grandiosity, helplessness, hopelessness, or suicidal or homicidal ideation.

Viator reported her daily activities included watching a little television, lying on the sofa and bed, moving around for a few minutes, and repeating the pattern. She does not perform any inside or outside chores or activities. She leaves the house only about twice a month to shop. She greatly fears the Covid virus. She talks with family and friends daily, and she believes she gets along well with those people. She experienced no major interpersonal conflicts in the six months preceding the interview.

Dr. Kline assessed depression in remission, social anxiety in fair remission, and some possible hypomanic episodes from time to time. He did not believe Viator met the criteria for bipolar disorder, and he suspected she was malingering about her daily activities. Dr. Kline characterized Viator's mental health prognosis as unknown, as she provided questionable effort and motivation. Viator also had unknown restriction of activities, unknown constriction of interests, and at worst a mild restriction in her ability to relate to others. Dr. Kline believed she could manage benefits, though she did have a history of mental "slowness." She had adequate ability to function independently and adequate abilities to understand, carry out, and remember instructions and respond appropriately to supervision, coworkers, and work pressures in a work setting from a mental health perspective. (Tr. 452-55).

The ALJ found Dr. Kline's opinion somewhat persuasive, as Dr. Kline's examination findings and other medical evidence supported the opinion. Specifically, the record included no psychological or psychiatric treatment records, and examination findings from other providers throughout the administrative record reflected appropriate mood and affect and normal orientation, memory, insight, and judgment. Even so, the ALJ chose to give Viator "the benefit of the doubt regarding daily activities based on her physical symptoms to improve with conservative treatment resulting in surgical intervention and additional limitations." (Tr. 34).

Dr. Julia Boothe conducted a consultative physical examination on February 1, 2021. Viator reported pain in her back, foot, hand, hip, leg, knee, neck, and shoulder.

She also experienced stiffness, joint swelling, and muscle spasms throughout her neck and hips; bilateral foot numbness; left hand weakness and tingling; and left shoulder tingling.  She did not report any psychological symptoms.

During the clinical examination, Viator displayed limited range of motion in almost all areas of her cervical and lumbar spine, hip, knee, and shoulder.  She experienced mildly impaired dexterity and mildly impaired grip strength.  Her right grip strength was four out of five, and her left grip strength was three out of five.  She displayed tibial tubercle prominence in the left knee with mild swelling and trigger points in her knees, left shoulder, and upper back.  She displayed normal reflexes in the upper and lower extremities, full orientation, and appropriate mood and affect.  Dr. Boothe assessed cervical degenerative disc disease, fibromyalgia, bipolar disorder that waxes and wanes, and left knee degenerative joint disease with bursitis.  Viator displayed stiffness on standing, and she required the support of a chair to push up.  She limps with left knee pain and buckling, but she does not use a walker.  She could not get onto the examination table, stand on her heels or toes, or squat.  (Tr. 480-83).

Because Dr. Boothe did not provide a statement about the actions Viator could still perform despite her impairments, the ALJ rightfully concluded Dr. Boothe did not offer a medical opinion that required administrative consideration pursuant to Social Security regulations.  (Tr. 34); *see* 20 C.F.R. § 404.1513(a)(2) (defining a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or

restrictions . . . .").

On February 4, 2021, Dr. Victoria Hogan, a state agency consultant, conducted a Physical Residual Functional Capacity evaluation at the administrative level. She opined Viator could occasionally lift and/or carry up to 20 pounds, and she could frequently lift and/or carry up to ten pounds. She could perform unlimited pushing and pulling movements with her upper and lower extremities, within the confines of her lifting and carrying limitations. She could stand and/or walk for a total of six hours in an eight-hour workday, and she could sit for a total of six hours in an eight-hour workday. She could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. She experienced no manipulative, visual, or communicative limitations. She should avoid concentrated exposure to extreme cold and heat, but she could tolerate unlimited wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. She should avoid all exposure to hazards such as machinery, heights, and uneven terrain. Dr. Hogan relied on x-ray and MRI results and clinical findings such as minor limitation of range of motion, mild grip strength reductions, mild swelling, trigger points in the left shoulder and back, normal cranial nerve and reflexes, use of a chair to push up from sitting position, limping and buckling of knee, inability to get on examination table or stand on heels toes, inability to squat, and no use of cane or walker. (Tr. 101-02).

On April 5, Dr. Andre Fontana, a state agency consultant, conducted a Physical Residual Functional Capacity evaluation upon reconsideration at the administrative

level.  Dr. Fontana opined Viator could occasionally lift and/or carry up to 20 pounds, and she could frequently lift and/or carry up to ten pounds.  She could perform unlimited pushing and pulling movements with her upper and lower extremities, within the confines of her lifting and carrying limitations.  She could stand and/or walk for a total of six hours in an eight-hour workday, and she could also sit for a total of six hours in an eight-hour workday.  She could frequently balance and climb ramps and stairs. She could occasionally crawl, crouch, kneel, stoop, and climb ladders, ropes, and scaffolds.  She had unlimited ability to reach in front or laterally, handle, finger, and feel.  She could frequently reach overhead with her left upper extremity.  She had no visual, communicative, or environmental limitations.  (Tr. 109-10).

The ALJ found Dr. Hogan's and Dr. Fontana's opinions somewhat persuasive, as "they [were] supported by their findings based on the evidence available at the time they were rendered."  (Tr. 33).  However, he rejected Dr. Fontana's finding that Viator could frequently reach overhead with her left upper extremity.  The ALJ acknowledged both that the previous x-ray, MRI, and nerve conduction findings warranted imposing limitations related to Viator's cervical spine and left shoulder, and that Viator experienced improved strength and range of motion in the cervical spine and left shoulder after her cervical spinal surgery.  Therefore, the ALJ found Viator could occasionally, not frequently, lift overhead.  (Tr. 34).

On February 5, 2021, Virginia Bare, Ph.D., a state agency consultant, assessed Viator's mental health condition.  She concluded Viator experienced mild limitation of

her abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. She experienced no limitation of her abilities to understand, remember, or apply information. She concluded Viator experienced some mental health symptoms, yet the medical evidence as a whole did not support the extent of mental health impairment she alleged. (Tr. 99-100).

On April 21, 2021, Joanna Koulianos, Ph.D., a state agency consultant, evaluated Viator's mental health condition on reconsideration at the administrative level. She imposed the same mental limitations as Dr. Bare. (Tr. 107-08).

The ALJ found the opinions of Drs. Bare and Koulianos persuasive, "as they are supported by the claimant's lack of treatment and her history of normal mental status exams," as well as by normal findings during Dr. Kline's consultative examination. (Tr. 34).

The ALJ concluded this record medical evidence did not fully support Viator's allegations of disabling symptoms. Though the record included some abnormal physical findings such as tenderness and decreased range of motion in the cervical spine, Viator's range of motion and strength improved with postoperative physical therapy. The ALJ also observed that Viator "had abnormal physical findings such as multiple soft tissue tender points and joint tenderness prior to the alleged onset date and it did not prevent her from working." (Tr. 32). Regarding Viator's reported mental impairment symptoms, the ALJ noted she did not receive mental health medication or other treatment from a mental health professional. Dr. Kline reported normal mental

health findings during his examination, and records from office visits also reported normal findings. (*Id.*).

As summarized above, the record clearly supports the ALJ's conclusion that Viator did not experience disabling mental health symptoms. Viator reported subjective mental health symptoms like depression, social anxiety, and occasional manic episodes, but she never received any mental health treatment, and the mental health evaluations from Dr. Kline and the stage agency consultants did not report any disabling functional impairments.

The ALJ also accurately noted Viator continued working until October 7, 2019, despite consistently reporting pain symptoms, including up to 72 tender joints during a single assessment. Her ability to work despite her impairments supports the ALJ's finding that Viator did not experience disabling physical symptoms during that time period. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275-76 (11th Cir. 2003) (considering that the claimant "worked for several years in spite of his seizure disorder"). In addition, the medical records from that time period reflect that though Viator consistently reported significant pain and fatigue, she also reported over-the-counter medications helped her pain, and she displayed normal gait.

After Viator fell at work on August 26, 2019, she reported additional symptoms related to her neck and shoulder, and imaging tests revealed degenerative changes in her cervical spine. However, neither Viator's subjective complaints nor the mere presence of degenerative spinal changes necessitates a finding of disability. *See Moore,*

405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11ᵗʰ Cir. 1986)) ("To a large extent, Moore questions the ALJ's RFC determination based solely on the fact that she *has* varus leg instability and shoulder separation.  However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard.") (emphasis in original); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11ᵗʰ Cir. 2010) (diagnosis insufficient to establish disability); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11ᵗʰ Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

Moreover, the court must assess not whether some evidence supports Viator's contentions that she experiences disabling limitations, but whether substantial evidence supports the ALJ's decision to find the opinions unpersuasive.  *Moore*, 405 F.3d at 1213 (quoting *Bloodsworth,* 703 F.2d at 1239) ("To the extent that Moore points to other evidence which would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of our appellate review, which precludes us from 're-weigh[ing] the evidence or substitut[ing] our judgment for that [of the Commissioner] . . . even if the evidence preponderates against' the decision.") (alterations in original).  It does.

Viator's condition improved with repeated treatment from Honeycutt Chiropractic.  Most clinical examinations revealed only fairly mild reduction of muscle strength, grip strength, and range of motion, and Viator typically displayed normal gait.

Though she continued to experience problems with her neck, Dr. Davis released her to full work duty vis-à-vis her shoulder on May 21, 2021.  On July 21, 2021, Dr. Smith imposed a 30-pound lifting restriction, and on October 26, 2021, he stated she could constantly lift up to ten pounds, frequently lift up to 20 pounds, and occasionally lift up to 35 pounds.  Her only other limitations included climbing and reaching above her shoulder.  Those restrictions comport with the ability to perform light work, within the additional limitations the ALJ imposed.  In addition, Viator's condition appeared to improve after her November 8, 2021, surgery.  Though she did not meet all the goals her physical therapist set for her, and she continued to report pain between level four and level seven throughout physical therapy, she significantly improved her strength and range of motion.  Her physical therapist characterized her progress as good and the limitations on her upper extremity range of motion as slight.

The consultative and state agency assessments also provide substantial evidentiary support for the ALJ's opinion about the extent of Viator's limitations.  Dr. Boothe did not provide a function-specific assessment, and her clinical evaluation contains mixed results.  Most of the functional limitations Dr. Boothe described – including stiffness on standing, using a chair to push up, limping with knee pain and buckling, and inability to get onto the examination table, stand on heels or toes, and squat – related to Viator's lower extremities, and the remainder of the medical evidence does not support disabling limitations in the lower extremities.  Dr. Boothe also detected some upper extremity impairments, but those fell within the mild to moderate

range.  Drs. Hogan and Fontana, the state agency consultants, assessed limitations generally consistent with the ALJ's RFC finding.

> The ALJ also found Viator's
>
> activities of daily living further diminish the persuasiveness of her allegations.  The claimant . . . reported that she can follow written and spoken instructions, manage her personal care with some limitations, take medications without needing reminders, prepare meals with assistance, drive and leave home, sporadically shop in stores, manage her finances, and talk with others on the phone . . . .  At the psychological consultative examination, the claimant reported that she watches television, talks with family and friends, shops in stores twice a month, and fee[l]s that she gets along well with people . . . .  These activities of daily living are consistent with the ability to perform a range of light work and are directly contradictory to the claimant's allegation that she is unable to work in any capacity.

(Tr. 33).

Viator argues the ALJ misconstrued the evidence regarding her activities.  Social Security regulations permit an ALJ to consider a claimant's daily activities when assessing the effect of her subjective symptoms on her ability to work.  *See* 20 C.F.R. § 404.1529(c)(3)(i).  But, as numerous courts have cautioned, "'participation in everyday activities of short duration' does not disqualify a claimant from disability," as "[i]t is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances."  *Love v. Colvin*, No. 6:15-CV-338-WMA, 2016 WL 741974, at *5 (N.D. Ala. Feb. 24, 2016) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997)) (internal quotation marks and citations omitted).  Rather, an ALJ should rely upon evidence of a claimant's daily activities as a

"basis to discredit a claimant's testimony when [his or] her daily activities demonstrate a higher level of functioning than her alleged disabling symptoms would allow." *Id.*

Though the ALJ's statement that Viator's daily activities "are directly contradictory to [her] allegation that she is unable to work in any capacity" follows this legal framework, his statement that Viator's daily activities "are consistent with the ability to perform a range of light work" does not. The minimal activities Viator described do not add up to the ability to perform the functional requirements of light work, including lifting up to 20 pounds, walking, standing, and/or pulling arm and leg controls.

However, even if the ALJ erred in his statements about Viator's daily activities, that error caused no harm. While Viator's daily activities would not in and of themselves equate to the ability to perform full-time work, the ALJ did not rely solely on those activities as a basis for his RFC finding. He also found that when combined with the other evidence of record, Viator's activities undermined her subjective complaints. That determination found support both in applicable law and in the record evidence. Moreover, as discussed previously, the medical and other record evidence provides substantial evidentiary support for the ALJ's RFC finding.

In summary, taken as a whole, the medical and other record evidence provides substantial evidentiary support for the ALJ's RFC finding, and the ALJ applied proper legal standards. Accordingly, the ALJ did not err in assessing Viator's residual

functional capacity or finding Viator did not suffer a disability.[5]

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

The court will enter a separate final judgment.

**DONE** this 6th day of May, 2024.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[5] Viator argues the ALJ "cherry-picked" only the facts that supported his decision and ignored other facts that would support a disability finding.  (Doc. 15, at 15-16).  However, as set forth herein, the court finds the record evidence as a whole provides substantial evidentiary support for the ALJ's decision.